720 A.2d 473

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jerome GIBSON, Appellant.**

Supreme Court of Pennsylvania.

Argued Feb. 2, 1998.

Decided Nov. 17, 1998.

Reargument Denied Dec. 18, 1998.

would not be entitled to relief on the basis of these claims under either analysis.

650

652

John J. Fioravanti, Jr., Doylestown, for J. Gibson.

C. Theodore Fritsch, Doylestown, Robert A. Graci, Office of the Atty. Gen., for Com.

Before FLAHERTY, C.J., and ZAPPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of Bucks County after a jury found Appellant, Jerome Gibson, guilty of first-degree murder, robbery and possession of instruments of crime. We affirm.

The following facts were adduced at trial. On the morning of September 29, 1994, Gibson sought to obtain an automobile, as his car had recently broken down. He asked a friend, Sean Hess, for $200 so that he could purchase a new vehicle. When

Hess refused, Gibson spoke of "making a move," meaning that he would commit a robbery.

At approximately noon on that same day, Gibson went to an automobile dealership in Bristol Township to look for a replacement vehicle. Although he expressed an interest in purchasing a vehicle that was shown to him by salesman Glen Kashdan, he did not have the necessary funds. He told Kashdan, however, that his mother maintained sufficient funds in a bank account in Bristol Borough to pay for the vehicle. After Kashdan drove Gibson to the bank in a fruitless effort to withdraw the non-existent funds, he dropped Gibson off at a shopping center in Bristol Township, about one mile from the eventual scene of the crime. Gibson was wearing a dark hooded sweatshirt and jeans.

Melissa Paolini, who worked at the bank where Kashdan had taken Gibson, observed the two men enter the bank at approximately 1:15 p.m. Gibson's picture was taken by the bank's monitor camera and was later identified by Paolini at trial. The picture clearly depicted Gibson wearing a dark hooded sweatshirt.

Shortly before 2:00 p.m., Gibson met Paulinda Moore, a long-time acquaintance, in the shopping center. Gibson showed Moore a handgun that was tucked into the waistband of his pants and stated that he needed money and was going to rob somebody. He added that if his prospective victim saw his face, he would shoot him. Gibson and Moore then parted company and Gibson continued on foot to Bristol Borough.

Kevin Jones, another acquaintance, encountered Gibson a little while later. Gibson informed Jones that he knew "a guy that had money," whom he was going to rob, killing him if necessary.

At approximately 2:00 p.m., Vera DuBois, Gibson's aunt, saw Gibson on foot in Bristol Borough and noticed that he was wearing a dark hooded sweatshirt. At 2:20 p.m., Gibson entered a jewelry store. Leonard Wilson, the store's proprietor, became suspicious of Gibson when he noticed that Gibson appeared to be observing the store itself, rather than looking

at jewelry. After a brief conversation with Wilson, Gibson left the store.

Between 2:30 and 3:00 p.m., Kimberly Rankins, another acquaintance, nearly hit Gibson with her car as he was crossing Mill Street in the direction of the Ascher Health Care Center ("Ascher Health") in Bristol Borough. The last time that Rankins observed Gibson that day, he was wearing a dark blue sweatshirt and was approximately twenty-five feet away from the entrance of Ascher Health, walking towards it.

Shortly before 3:00 p.m., Michael Segal, a shopkeeper at a store directly across the street from Ascher Health, heard a gunshot from inside Ascher Health. Segal looked across the street and saw Robert Berger, the proprietor of Ascher Health, struggling with an assailant behind the store counter. When Segal observed that the assailant had a gun, he dialed "911." While on the telephone, he heard two more gunshots. He looked across the street and saw Berger lying on the floor while the assailant rifled through the cash register drawers. Segal then observed the assailant leave the store, stuffing items into his pants, and walk up Mill Street towards an apartment building. Segal was unable to see the assailant's face, but he did observe that the man was wearing a dark blue hooded sweatshirt. Segal later testified at trial that the man's size, build and complexion matched those of Gibson.

Alfonso Colon, who was in a second floor apartment above Ascher Health that afternoon, walked downstairs and went outside after hearing the three gunshots. He saw Gibson, whom he positively identified at trial, leaving Ascher Health and walking toward him while stuffing an object that appeared to be a handgun into his pants. Upon seeing Colon, Gibson crossed Mill Street and headed in a different direction.

At 2:58 p.m., the police responded to Segal's call. They entered Ascher Health and found Berger lying dead on the floor from gunshot wounds. A cash drawer was open and there was an empty gun holster on the floor. Berger was pronounced dead upon arrival at the hospital at approximately 3:45 p.m. An autopsy revealed that he had suffered three

gunshot wounds: a fatal wound to the left chest, a wound to the upper right chest, and a wound to the upper left arm. Two .32 caliber projectiles were removed from the body. It was later determined that approximately $1,400 in cash had been stolen during the robbery, along with a .38 caliber handgun belonging to Berger. There was no evidence that Berger's gun had been fired during the robbery.

Shortly after 3:00 p.m. on the day of the shooting, Gibson arrived at the home of his cousin, Pamela Harrison. When Harrison responded to Gibson's knock on her door, she observed that he was wearing a dark hooded sweatshirt and was sweating. Harrison also heard police sirens. Gibson asked to come into the house and Harrison admitted him, noticing that he was carrying a handgun. After hiding his sweatshirt in Harrison's basement, Gibson left the house. He returned later that evening and retrieved the sweatshirt without Harrison's permission.

After leaving Harrison's house, Gibson met his friend, Sean Hess, in the shopping center where Gibson had been earlier that day. Gibson told Hess that he had shot a man three times and taken his money. Gibson also stated that the victim had a gun, but that he had used his own gun.

The following day, while at a bar, Gibson admitted to Bernard McClean that he had shot the old man in Bristol three times, explaining that he had been broke and needed the man's money. He later told his friends, Herman Carroll and Eddie Jones, that he had robbed and killed the victim. He also told Edward Gilbert, another friend, that he had killed the victim to obtain money with which to purchase a vehicle. He gave Gilbert the .32 caliber handgun, along with Berger's .38 caliber handgun, to keep for him. Berger's gun was later recovered at a motel in Bristol Township, but Gibson's gun was never located.

On October 2, 1994, three days after the murder, two detectives from the Bucks County District Attorney's Office, who had received information implicating Gibson in the murder, went to the apartment where Gibson was staying and

waited outside in their car. Shortly thereafter, Gibson and some other individuals came out of the apartment. Gibson approached the detectives and asked them if they wished to speak with him. In response to Gibson's inquiry, the detectives told him that they wished to talk to him about a murder that had occurred on Mill Street on September 29, 1994. Gibson asked if he was under arrest and the officers replied that he was not. They suggested, however, that Gibson speak with them at the Bristol Borough Police Station, since there were other people nearby. The detectives made it clear that Gibson could proceed to the station by his own transportation, that he would be free to leave the station at any time, and that he could terminate the conversation whenever he wished. Gibson acquiesced and followed them to the police station in his own vehicle, which he had purchased the day after the shooting.

Upon arriving at the police station, the detectives led Gibson to an interview room, where another detective and a Bristol Borough police officer joined them. Gibson was again advised that he was not under arrest and could leave the station at any time. When the detectives told Gibson that they wanted to discuss the robbery and murder of Berger, he indicated that he wanted to clear the matter up and would speak with them. The interview lasted for a little over two hours, during which Gibson not only denied any culpability for the shooting, but also denied having been in Bristol Borough at any time after August 2, 1994. Following the interview, Gibson agreed to a search of his vehicle and signed a consent form. During the search, Gibson initiated a conversation with one of the detectives, asking him a hypothetical question regarding what would happen if someone were attacked by a man with a gun and shot and killed his attacker. Gibson then left the police station in his vehicle.

On October 6, 1994, Gibson was arrested and charged with the robbery and murder of Berger, as well as possession of instruments of crime. Bail was denied, and while Gibson was incarcerated pending trial, he admitted to inmates Glenn Pollard, Kenneth Johnson and Kevin Jones that he had com-

mitted the crimes. Prior to trial, Gibson moved to suppress his statements to the police during the October 2, 1994 interview, as well as the statement that he made to the detective during the search of his car. The motion was denied following a hearing, and the case proceeded to trial.

During the guilt phase of trial, the Commonwealth presented the testimony of the numerous witnesses who had seen or spoken with Gibson either immediately before or after the shooting, including the testimony of those witnesses to whom Gibson had inculpated himself. Additionally, several detectives and police officers testified for the Commonwealth concerning their observations of the crime scene, the collection of evidence, and the statements that Gibson made during the course of his interview, as well as his hypothetical question concerning the shooting.

Gibson presented five witnesses whose testimony supported his alibi defense and contradicted the testimony of certain inmates who had testified concerning his inculpatory statements. Gibson also took the stand and testified that he was not on Mill Street on the afternoon of the murder, but did admit that he had been with Kashdan, the car salesman, at the bank in Bristol Borough earlier that day. Gibson further admitted that he had lied to the police concerning his whereabouts on the day of the murder.

At the conclusion of the guilt phase, the jury found Gibson guilty of first-degree murder, robbery and possession of instruments of crime. The trial proceeded to the penalty phase, during which the Commonwealth introduced evidence in support of two aggravating circumstances: perpetration of the homicide during the commission of a felony, 42 Pa.C.S. § 9711(d)(6), and a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9). The Commonwealth moved to incorporate the trial record to establish the fact that the homicide was committed during the perpetration of a felony, and the trial court granted the motion.

In support of the second aggravating circumstance, the Commonwealth introduced evidence of two prior robbery convictions, three prior burglary convictions, and a prior aggravated assault conviction. All of the burglary convictions involved residences.

Gibson presented four witnesses who testified concerning mitigating factors. Gibson's father, John Gibson, testified that Gibson had been neglected as a child and that Gibson's mother had been an alcoholic. Dr. Allan Tepper, a forensic psychologist, also testified concerning Gibson's childhood and stated that, in his opinion, Gibson suffered from mental and emotional retardation and had problems with impulse control. Charlene Walker, a neighbor of Gibson's, testified that Gibson had always treated her respectfully. LaSondra Williams, a former paramour of Gibson's, testified that aside from a few arguments, Gibson had treated her well.

At the conclusion of the penalty phase, the jury found the two aggravating circumstances to have been established beyond a reasonable doubt. The jury found one mitigating circumstance: the evidence of Gibson's character and record and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). Finding that the aggravating circumstances outweighed the mitigating circumstance, the jury returned a verdict that Gibson be sentenced to death.

Gibson filed timely post-trial motions, which were denied by the trial court. On August 24, 1995, Gibson was sentenced to death for his first-degree murder conviction, with a consecutive sentence of ten to twenty years imprisonment imposed for his robbery conviction. No further penalty was imposed for the offense of possession of instruments of crime. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

Although Gibson does not challenge the sufficiency of the evidence, this Court is required to conduct an independent review of the sufficiency of the evidence supporting a first-degree murder conviction in all capital cases. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert.*

*denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In conducting this review, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as the verdict winner and determine whether the jury could have found every element of the crime to have been proven beyond a reasonable doubt. *Commonwealth v. Michael,* 544 Pa. 105, 110, 674 A.2d 1044, 1047 (1996).

This Court succinctly summarized the requisite proof of first-degree murder in *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190 (1997):

> In first degree murder cases, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with deliberation. 18 Pa.C.S.A. §2502(d); *Commonwealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another. *Id.* Death caused by the use of a deadly weapon upon a vital part of the victim's body is sufficient to prove the specific intent required for a conviction of first degree murder. *Commonwealth v. LaCava,* 542 Pa. 160, 171, 666 A.2d 221, 226 (1995).

*Id.* at 281–82, 701 A.2d at 196.

Here, the evidence at trial showed that Berger was shot three times at close range with a .32 caliber handgun. The post-mortem examination revealed that one of the bullets perforated the victim's left lung and aorta. The testimony of numerous witnesses, whom the jury found credible, identified Gibson as the assailant and placed him in the vicinity of Ascher Health at the crucial time, thereby negating his alibi defense. Moreover, prior to the shooting, Gibson told a friend that he was going to rob "a guy that had money" and kill him if necessary, and after the shooting he admitted to several friends and fellow inmates that he had shot the victim. Thus, the evidence in this case is clearly sufficient to support the conviction of first-degree murder, and we now turn to the issues raised by Gibson in this appeal.

## GUILT PHASE

Gibson first challenges the admission of his statements to the police during the interview and subsequent search of his vehicle on October 2, 1994. He claims that the interview constituted a custodial interrogation for which *Miranda* warnings were required, and that the officers' failure to give such warnings rendered his statements during the interview inadmissible. He further claims that, although his remarks to the officers during the search of his car were unsolicited, they were tainted by the officers' initial failure to advise him of his privilege against self-incrimination during the interview. Accordingly, Gibson contends that the trial court erred in denying his motion to suppress all of his statements.

In reviewing a challenge to the denial of a suppression motion, the relevant inquiry is whether the factual findings of the trial court are supported by the record and whether the legal conclusions drawn from those findings are correct. *Commonwealth v. Cortez*, 507 Pa. 529, 532, 491 A.2d 111, 112, *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). "When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense which remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Commonwealth v. Hall*, 549 Pa. at 283, 701 A.2d at 197 (citing *Cortez*, 507 Pa. at 532, 491 A.2d at 112).

A person is deemed to be in custody for *Miranda* purposes when "[he] is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being

restricted." *Commonwealth v. Williams,* 539 Pa. 61, 74, 650 A.2d 420, 427 (1994) (citations omitted).

■ Applying this standard to the record before us, we note that before Gibson agreed to go to the police station and talk to the officers, the officers told him that he was not under arrest. He voluntarily drove to the station in his own car. Once he arrived there, he was told that he was free to leave at any time. He was not restrained in any way, nor was he subjected to force or the threat of force. The door to the room where the interview took place was not locked. At the conclusion of the interview, Gibson voluntarily consented to the search of his vehicle and, upon completion of the search, he drove away and was not placed under arrest until four days later. Based upon these facts, the trial court did not err in concluding that a reasonable person in such circumstances would have believed that he was free to leave and therefore, that Gibson's statements during the interview were not the product of a custodial interrogation.

■ Furthermore, Gibson's statements to the police during the search of his vehicle were made voluntarily and were not responsive to any queries by the officers; rather, Gibson initiated the conversation. It is well settled that a gratuitous utterance, unsolicited by the police, is admissible and that *Miranda* warnings are unnecessary under such circumstances. *Commonwealth v. Abdul–Salaam,* 544 Pa. 514, 533, 678 A.2d 342, 351 (1996), *cert. denied,* 520 U.S. 1157, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997). Accordingly, the trial court did not err in denying Gibson's suppression motion and admitting his statements at trial.

■ Gibson's second contention is that the verdict was against the weight of the evidence because the Commonwealth's case was based upon contradictory identification testimony and unreliable testimony from incarcerated, convicted felons. "A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Appellate review, therefore, is a review of the exercise of discretion, not the underlying question

whether the verdict is against the weight of the evidence." *Commonwealth v. Brown*, 538 Pa. 410, 435–36, 648 A.2d 1177, 1189 (1994). The trial court, in the exercise of its discretion, may award a new trial on the basis that the verdict is against the weight of the evidence if the verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155 (1986).

Here, the credibility of the Commonwealth's identification witnesses was vigorously challenged on cross-examination by defense counsel. The trial court instructed the jury that where the accuracy of certain identification testimony is doubtful, such testimony is to be received with caution. *See Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820, *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954). The jury, however, found such testimony to be credible. With respect to the testimony of Gibson's fellow inmates, the jury was instructed that, in evaluating the credibility of the witnesses, it should determine whether any witnesses had a deep interest in the outcome of the case. Again, the jury found the testimony to be credible.

Credibility determinations are strictly within the province of the finder of fact; therefore, an appellate court may not reweigh the evidence and substitute its judgment for that of the finder of fact. *See Commonwealth v. Pierce*, 537 Pa. 514, 530–31, 645 A.2d 189, 198 (1994) (citing *Commonwealth v. Farquharson*, 467 Pa. 50, 59–60, 354 A.2d 545, 550 (1976).). Accordingly, in light of the jury's determination that the testimony of the Commonwealth's witnesses was credible, we perceive no abuse of discretion by the trial court in ruling that the verdict was not against the weight of the evidence.

In his next two issues, Gibson challenges the trial court's instructions to the jury. Specifically, he contends that the trial court abused its discretion in failing to instruct the jury that in evaluating the credibility of the police officers who testified at trial, they should consider the fact that the officers may have an interest in the outcome of the case because they sought a conviction. Gibson further contends that the trial

court's instruction regarding reasonable doubt during both the guilt and penalty phases improperly diminished the Commonwealth's burden of proof and infringed upon the presumption of innocence, thereby entitling him to a new trial.

 A trial court has broad discretion in phrasing its instructions to the jury and can choose its own wording so long as the law is clearly, adequately and accurately presented to the jury for consideration. *Commonwealth v. Hawkins*, 549 Pa. 352, 389–91, 701 A.2d 492, 511 (1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998). Furthermore, a trial court need not accept counsel's wording for an instruction, as long as the instruction given correctly reflects the law. *Commonwealth v. Ohle*, 503 Pa. 566, 582, 470 A.2d 61, 70 (1983). In reviewing a challenged jury instruction, an appellate court must consider the entire charge as a whole, not merely isolated fragments, in order to ascertain whether the instruction fairly conveys the legal principles at issue. *Commonwealth v. Jones*, 546 Pa. 161, 192, 683 A.2d 1181, 1196 (1996).

 In this case, the trial court declined to use defense counsel's submitted point for charge that specifically referred to the officers' potential interest in the outcome of the case. However, the trial court gave the following instruction:

> Look to see whether any of the witnesses have a deep interest in the outcome of this case. I won't suggest to you that any witness or witnesses do or do not, but you determine whether any of the witnesses, and that includes all of the witnesses, have a deep interest in the outcome of this case, and if you decide that some witnesses have, then from that you may conclude that that witness would have a tendency to put his or her best foot forward, that is, to give his or her testimony in a light most favorable to himself or herself.... On the other hand, you may find a witness to be deeply interested in the outcome of this case, and in spite of that you may still find that that witness was truthful, and if you find that to be the case, then you should accept that witness' testimony.

Although this instruction does not explicitly refer to the officers, it adequately conveys the concept that the personal interest of a witness may have an impact upon his testimony and should be taken into account in making credibility determinations. Thus, the law was adequately and accurately conveyed to the jury.

Gibson also challenges the following portion of the trial court's instruction to the jury concerning reasonable doubt: "It should be such a doubt as would cause a reasonable person in the conduct of his or her own affairs to stop, hesitate and seriously consider as to whether or not he or she would do a certain thing before finally acting." [1]

Gibson claims that the trial court's conjunctive use of the words "stop" and "hesitate" improperly required doubt to rise to a higher level than that which would cause a reasonable person merely to "hesitate" before acting. Thus, Gibson contends that the jury was improperly led to believe that for reasonable doubt to exist, their doubt would have to rise to the level that would not merely cause hesitation, but would stop them from acting altogether.[2]

 There is no merit to this argument. In *Commonwealth v. Pearson*, 450 Pa. 467, 303 A.2d 481 (1973), this Court approved a jury instruction that reasonable doubt is such a doubt that would cause jurors to "halt, hesitate and refuse to take action," concluding that this instruction did not require a higher quantum of doubt by the jury. *Id.* at 474, 303 A.2d at 484–85; *see also Commonwealth v. Cannon*, 453 Pa. 389, 309 A.2d 384 (1973); *Commonwealth v. Orlowski*, 332 Pa.Super.

1. The trial court gave a similar instruction during the penalty phase: It should be a doubt which would cause a reasonable person in the conduct of his or her own personal affairs to stop, hesitate and to seriously consider whether or not he or she should do a certain thing.

2. We note that although defense counsel did not object to the trial court's instruction concerning reasonable doubt at either phase of the trial, the relaxed waiver standard employed in capital cases permits review of this issue on its merits. *See Commonwealth v. Gibson*, 547 Pa. 71, 91 n. 19, 688 A.2d 1152, 1162 n. 19, *cert. denied*, —— U.S. ——, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997); *Commonwealth v. Zettlemoyer*, 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19.

600, 481 A.2d 952 (1984). The charge in the present case fairly conveyed the legal principle at issue, namely, that a reasonable doubt is one that would cause a reasonable person to pause and contemplate the prudence of his action.

## PENALTY PHASE

Gibson next asserts that the aggravating circumstance at 42 Pa.C.S. § 9711(d)(6), commission of the homicide during the perpetration of a felony, is overbroad because there is no definition that limits the meaning of the term "felony." Thus, Gibson argues that this aggravating circumstance fails to genuinely narrow the pool of offenders eligible for imposition of the death penalty. *See Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

In *Commonwealth v. Basemore,* 525 Pa. 512, 582 A.2d 861 (1990), *cert. denied,* 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992), this Court rejected a vagueness challenge to Section 9711(d)(6), stating that the term "felony" is adequately defined by reference to the Crimes Code, 18 Pa.C.S. § 101 *et seq.,* which specifically designates those crimes which are felonies. Moreover, in *Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078 (1993), we stated that "[t]his court will not entertain arguments against the death penalty statute which are abstract in nature and are not relevant to the facts in the particular case." *Id.* at 235, 634 A.2d at 1090.

Here, not only has Gibson raised a challenge that is nearly identical to that rejected in *Basemore,* but he has also failed to demonstrate how, under the facts of this case, the term "felony" is vague or overbroad. The killing occurred during a robbery, which stands on its own as a dangerous felony and is not a lesser-included offense of murder, unlike aggravated assault. Thus, Gibson's argument is meritless.

Gibson's next claim is that the use of his three non-violent burglary convictions to establish the aggravating circumstance of a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9), was improper. He suggests that the trial court's instruction

required the jury to find this aggravating circumstance as a matter of law.

■ This Court has held that burglary is a crime involving the inherent use or threat of violence, and therefore the use of prior burglary convictions as an aggravating circumstance under Section 9711(d)(9) is appropriate. *See Commonwealth v. Rivers,* 537 Pa. 394, 415, 644 A.2d 710, 720 (1994), *cert. denied,* 516 U.S. 1175, 116 S.Ct. 1270, 134 L.Ed.2d 217 (1996); *Commonwealth v. Rolan,* 520 Pa. 1, 15, 549 A.2d 553, 559 (1988). The trial court's instruction was consistent with this precedent. Although it defined burglary as the type of crime included within the (d)(9) aggravator as a matter of law, it did not, as Gibson argues, bind the jury to find this aggravating circumstance. It remained for the jury to decide whether the evidence of Gibson's burglary convictions and convictions for other crimes amounted to a "significant history." Counsel was free to argue, and in fact did argue, the relevance of whether the crimes involved the actual threat or use of violence to the issue of whether such a significant history had been established.[3] Thus, we perceive no error by the trial court in permitting Gibson's prior burglary convictions to be used to establish the aggravating circumstance under Section 9711(d)(9).

Gibson next contends that the trial court erred in failing to instruct the jury that it could consider sympathy or mercy for Gibson if such arose from the evidence presented. Gibson concedes that the law is well settled that absolute "mercy verdicts" are prohibited. *See Commonwealth v. Henry,* 524 Pa. 135, 159-60, 569 A.2d 929, 941 (1990). He argues, however, that in *Henry,* the Court approved a jury instruction "that jurors *are permitted* to be swayed by sympathy *but only* where the sympathy results from the *evidence.*" *Id.* (emphasis in original). Thus, Gibson contends that the jury should have been informed that it could consider and give effect to

---

**3.** Notably, although Gibson's appellate brief asserts that the three burglary convictions at issue involved no threat of violence, there was no evidence introduced in the penalty hearing to this effect.

sympathy or mercy arising from the mitigating evidence by imposing a life sentence instead of the death penalty.

In *Commonwealth v. Hill*, 542 Pa. 291, 666 A.2d 642 (1995), this Court rejected the defendant's claim that the trial court should have instructed the jury that it could have dispensed mercy if it so chose, noting:

> [The a]ppellant was allowed to present and argue any evidence which was relevant and admissible in an attempt to convince the jury that the death sentence should not be imposed in his case. That is all that is constitutionally required.

*Id.* at 311, 666 A.2d at 652, quoting *Commonwealth v. Young*, 536 Pa. 57, 76, 637 A.2d 1313, 1322 (1993). Thus, the Court concluded that "the trial court did not err in failing to advise the jury that sympathy could be considered in its deliberations over the appropriate sentence." *Id.* at 312, 666 A.2d at 652.

Here, the trial court instructed the jury that based upon the mitigating evidence of Gibson's childhood, they were to consider how all of Gibson's background and history related to the circumstances of the offense. Although the trial court did not specifically refer to sympathy or mercy, it went into great detail concerning Gibson's family background and up-bringing, and how he might have been affected by his parents' alcoholism and lack of nurturing or attention. The trial court told the jury that all of this evidence related to the "catch-all" mitigating circumstance at Section 9711(e)(8). Furthermore, the trial court instructed the jury to consider all of the evidence presented by Gibson in determining whether Section 9711(e)(8) applied. Accordingly, viewed in the context of the entire charge, these instructions were adequate.

Gibson also contends that the trial court's instruction regarding mitigating evidence improperly conveyed to the jury the impression that for evidence to be mitigating, it necessarily must be linked to the circumstances of the offense. Gibson bases his argument on the following excerpt from the trial court's instruction:

> Now, I'm not suggesting that you consider all of these other things and read out of that the circumstances of his offense, but I am saying that in considering this mitigating factor, you should consider all of that background, all of that history, what he was and how he got to be that. Whether or not he's borderline mentally retarded, whether that creates frustration, impulsiveness because of his inability to deal with the world around him the way others do, and consider how that, if you find that to be the case, of course, *how that relates to the circumstances of his offense,* what he did and how he did it.

(emphasis supplied).

Viewed in the context of the trial court's entire instruction as a whole, the portion of which Gibson complains was merely an effort by the trial court to further explain the "catch-all" mitigating circumstance of Section 9711(e)(8), which had been presented to the jury. Moreover, the trial court told the jury:

> You may find whatever you may find. Anything you may find in this case from the evidence that you've heard which constitutes in your mind, in the mind of any of you, a mitigating circumstance, then it is a mitigating circumstance.

Accordingly, the jury instructions, viewed in their entirety, did not limit or restrict the jury's consideration of what constituted mitigating evidence.

Gibson further contends that the trial court's jury instruction prevented the jury from considering and giving mitigating effect to the uncontested evidence of his emotional disturbance. He claims that such instruction precluded the jury from considering any evidence of emotional disturbance with respect to Section 9711(e)(8) unless such disturbance was "extreme," as is required under the more specific aggravating circumstance set forth at Section 9711(e)(2). Again, Gibson's argument is merely an attempt to impose a contrary meaning upon the entire instruction by emphasizing an isolated fragment. Such approach is impermissible, as we must consider the instruction as a whole. *See Commonwealth v. Jones,* 546 Pa. at 192, 683 A.2d at 1196.

▮▮ Read in its entirety, the trial court's instruction concerning the jury's consideration of Gibson's emotional disturbance accurately conveyed the law to the jury, and the trial court's use of the word "extreme" did not distort the meaning of the mitigating circumstance at Section 9711(e)(8).

Finally, Gibson contends that the trial court's jury instruction improperly suggested that a life sentence could be imposed only if the mitigating evidence outweighed the aggravating evidence. During its instruction concerning the balancing of aggravating and mitigating circumstances, the trial court stated, "If the mitigating circumstance outweighs the aggravating circumstance, then the sentence is life." In *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), this Court addressed an identical challenge to the trial court's instruction regarding the weighing of aggravating circumstances against mitigating circumstances. In that case, the trial court instructed the jury that if it found that the mitigating circumstances outweighed the aggravating circumstances, then the verdict must be life imprisonment. This Court held that although the charge did not comport with the instruction mandated by the Sentencing Code,[4] the trial court's subsequent instructions concerning the verdict slip cured the technical error in the charge. Thus, the Court concluded that "[w]hen read in its entirety, the court's instructions on the weighing process w[ere] correct, any possible error having been cured by subsequent instruction." *Id.* at 49, 454 A.2d at 954.

▮▮ In the present case, although the trial court inaccurately paraphrased Section 9711(c), the court subsequently rectified this error when it read the verdict slip to the jury and explained the slip line by line. Furthermore, the verdict slip, which accompanied the jury into the deliberation room

4. Section 9711(c) provides:
[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or *if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.* The verdict must be a sentence of life imprisonment in all other cases.
42 Pa.C.S. §9711(c)(1)(iv) (emphasis supplied).

"clearly and in writing instructed the jury that the death penalty was required if there was 'at least one aggravating circumstance and no mitigating circumstance,' or, as was checked by the jury foreman, if 'the aggravating circumstance outweighs the mitigating circumstances.'" *Id.* Thus, the subsequent instructions given to the jury were sufficient to dispel any mistaken impressions it may have had.

## INDEPENDENT REVIEW OF THE DEATH SENTENCE

Having concluded that Gibson's claims are without merit, we must affirm the judgment of sentence unless we determine that

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).[5]

Upon review of the record, we conclude that the sentence imposed in this case was not the product of passion, prejudice or any other factor, but rather was based upon the evidence that Gibson killed the victim with premeditation during the robbery.

Additionally, we conclude that the two aggravating circumstances found by the jury were supported by the evidence. The Commonwealth presented evidence that Gibson shot the victim while robbing the store, thereby establishing that the homicide was committed during the perpetration of a

5. By legislation enacted June 25, 1997, subsection (h)(3)(iii) providing for proportionality review and a portion of subsection (h)(4) that references such review were stricken from 42 Pa.C.S. §9711(h). *See* Act of June 25, 1997, No. 28, §1 (Act 28), effective immediately. However, this Court will continue to undertake proportionality review in cases where the death sentence was imposed prior to the effective date of Act 28. *Commonwealth v. Gribble,* 550 Pa. 62, 89–91, 703 A.2d 426, 440 (1997).

felony, 42 Pa.C.S. § 9711(d)(6). The Commonwealth also presented evidence of Gibson's prior convictions for robbery and aggravated assault, in addition to his three prior burglary convictions, thus establishing that Gibson had a history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9).

Finally, having reviewed Gibson's sentence in light of the sentencing data compiled and monitored by the Administrative Office of the Pennsylvania Courts, we conclude that the sentence of death imposed upon Gibson is not excessive or disproportionate to the penalty imposed in similar cases. *See Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

Accordingly, we affirm the verdict and sentence of death imposed upon Jerome Gibson by the Court of Common Pleas of Bucks County.[6]

---

**6.** Pursuant to 42 Pa.C.S. §9711(i), the Prothonotary of the Supreme Court is directed to transmit, within ninety (90) days of the date the sentence of death is upheld by this Court, the complete record of this case to the Governor of Pennsylvania.