J-S16011-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :       PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| RANDALL JONES | : |
| | : |
| Appellant | : No. 768 WDA 2025 |

Appeal from the Judgment of Sentence Entered January 27, 2025
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0004261-2021

BEFORE: LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.:           **FILED: June 9, 2026**

Randall Jones appeals from the judgment of sentence, entered in the Court of Common Pleas of Allegheny County, after a jury convicted him of first-degree murder,[1] criminal conspiracy to commit homicide,[2] and carrying a firearm without a license.[3] On appeal, Jones claims that the verdict was against the weight of the evidence. After our careful review, we affirm.

The trial court set forth the factual history of this matter as follows:

On January 16, 2021, shortly after 2:00 a.m., Pittsburgh Police officers were dispatched to the Marathon gas station on Frankstown Road for a ShotSpotter[4] notification. Upon arriving

---

[1] 18 Pa.C.S.A. § 2502(a).

[2] *Id.* at § 903(a)(1); *id.* at § 2501(a).

[3] *Id.* at § 6106(a)(1).

*(Footnote Continued Next Page)*

at the scene, they found Robert Agurs (victim)[,] who had sustained multiple gunshot wounds to the leg and torso. The victim was transported to UPMC Presbyterian[,] where he was pronounced dead. An autopsy was performed on the victim[;] three spent 9mm bullets were recovered from the victim with the manner of death ruled a homicide owing to the multiple gunshot wounds to his torso and extremities.

Shortly after the shooting, City of Pittsburgh homicide detectives responded to the scene and located, inter alia, fifteen 9mm shell casings containing the head stamp "FC 9mm+P," and seven fired bullets, all of which were later determined to have been fired from the same weapon. Detectives also recovered video from the gas station security system[,] which captured the actual shooting, and which will be discussed hereinbelow.

During the course of the investigation, detectives learned that the victim had been at "Club VIP" (club) prior to being shot. The victim arrived at the club around midnight and parked his vehicle in a lot across the street from the club. Shortly after the victim's arrival, three vehicles[—]a black Jeep, a Range Rover, and a Jaguar[—]arrived and parked in front of the club in a reserved section.

Club security officer, Asha Spruill, observed a known group, nicknamed the "Chicago Boys," in the Jaguar and Range Rover. She also observed a Jeep occupied by Michael James (driver), [Jones] (front seat passenger), and Dennis Alexander (rear seat passenger). Both [Jones] and Alexander went into the club with the other individuals while James remained in the Jeep the entire time the others were in the club. The group was in the club for approximately two hours prior to the victim exiting the club. Video surveillance showed that the victim exited the club shortly before 2:00 a.m. and drove out of the parking lot; the black Jeep followed the victim's vehicle to the Marathon gas station, which was only a few blocks away. Once the victim was outside his vehicle at the gas pumps, [Jones,] the front seat passenger[] of the Jeep[,] extended a weapon out of his window and shot the victim. The Jeep with the three occupants then fled the scene.

---

[4] Pittsburgh Police Officer Jason Braun testified that "ShotSpotter" is an app that notifies police when gunshots are detected and provides the address where the shots were fired. *See* N.T. Trial, 10/15/24, at 44-45.

Minutes after the shooting[,] the Range Rover was pulled over by Pittsburgh Police, and the occupants were identified as Stephen and Tony Collins. The Collins brothers were not detained at that time, but the investigation developed them as suspects in putting out the contract on the victim. The investigation further revealed that the occupant of the Jaguar was Darrius Golden, also suspected to be associated with the Collins brothers. The Jeep was identified as having an Indiana registration (FL362ABW), which was registered to Enterprise Rental Company, and had been rented by Ashton Taylor, the paramour of Dennis Alexander.

In the days that followed, detectives obtained a search warrant for Alexander's [R]ing account and located video recordings from inside his bedroom that depicted events in the hours after the murder. Alexander talked to an unknown male[,] indicating that they were "good," and "she" had turned the "bitch" in, referring to the Jeep being returned to the rental company. Additionally, Alexander spoke with a female on FaceTime indicating that "they" had gone to Trappers (Club VIP) that night, and that James stayed in the Jeep as the driver while [Alexander], [Jones], and the others went inside the club. Alexander further stated that he knew the story would be on the news, but that he was not worried because James had pulled the Jeep into the gas station in a way as to obscure the license plate. Alexander indicated that a "hit" had been put out on the victim due to disputed drug[-]related activities. The video also showed Alexander talking to his cousin[,] indicating that she needed to get him out of the area because they had "dropped someone last night," and that they did it at the gas station.

Alexander testified at trial as a Commonwealth witness pursuant to a plea agreement. [Jones], Alexander, and James had been together most of that day. Alexander indicated that he was with both [Jones] and James at the time of the murder, and that James was driving the Jeep while [Jones] was the front seat passenger. Alexander provided a vivid and detailed description of the events to include: (1) after leaving the club together, Alexander got in the back passenger seat with James remaining in the driver seat and [Jones] entering the front passenger seat; (2) James then drove to the Marathon gas station, and en route[, Jones] and James discussed shooting the victim; (3) minutes later[,] James drove/positioned the vehicle near the gas pumps and [Jones] pulled a firearm from the center console and shot the victim out of the passenger window; (4) that both [Jones] and James knew of the intended "hit" on the victim that night; (5) that James

- 3 -

parked the Jeep at the gas station in a way that allowed for [Jones] to shoot the victim from the passenger window; (6) minutes after the shooting, James let Alexander out of the vehicle at a nearby apartment complex[,] where Alexander then contacted his girlfriend to call him an Uber home; (7) upon arriving home, [Jones] and James were at [Alexander's] residence[,] where the parties discussed what had happened and the "hit" on the victim; and (8) the three eventually left the house when Collins picked them up, and went to Collins' house in North Versailles[,] where they reunited with Golden.

Additional investigation revealed a series of text messages between Alexander and James shortly after the murder discussing Alexander trying to obtain a Lyft out of the area. Alexander's phone records also showed communication between the two back to April 26, 2020. Specifically, there were text messages between James and Alexander regarding paying James money, and the two exchanged various text messages involving depositing money into James' account.

A search warrant was executed for the call detail records [] of [Jones'] cellular records[,] which placed [Jones] in the Pittsburgh area on the night of the shooting and in the vicinity of the Ross Park Mall earlier that day. Additionally, the call records placed [Jones] in the area where Alexander's residence was located approximately forty-eight minutes after the shooting. Finally, records revealed that [Jones] was not licensed to carry a firearm in the Commonwealth of Pennsylvania.

Trial Court Opinion, 10/16/25, at 4-9 (unnecessary capitalization and citations to record omitted).

Jones proceeded to a joint jury trial with co-defendant James on October 15, 2024, at the conclusion of which Jones was convicted of the above-mentioned offenses. On January 27, 2025, the trial court sentenced Jones to consecutive sentences of lifetime incarceration for first-degree murder, five to ten years' incarceration for conspiracy, and two to four years' incarceration for firearms not to be carried without a license. Jones filed timely post-

sentence motions, which the trial court denied on May 12, 2025. Following reinstatement of his direct appellate rights on June 16, 2025,[5] Jones filed a timely nunc pro tunc notice of appeal followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. His sole appellate claim challenges the weight of the evidence supporting his convictions.

Our standard of review of the denial of a weight claim by a trial court is to examine "the exercise of discretion, not [] the underlying question of whether the verdict is against the weight of the evidence." **Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013), quoting **Commonwealth v. Widmer**, 744 A.2d 745, 753 (Pa. 2000). In a post-sentence motion, a weight claim "is addressed to the discretion of the trial court." **Widmer**, 744 A.2d at 752. "In order for a defendant to prevail on a challenge to the weight of the evidence, 'the evidence must be so tenuous, vague[,] and uncertain that the verdict shocks the conscience of the court.'" **Commonwealth v. Talbert**, 129 A.3d 536, 546 (Pa. Super. 2015), quoting **Commonwealth v. Sullivan**, 820 A.2d 795, 806 (Pa. Super. 2003). A trial court's denial of a motion based on a weight claim "is the least assailable of its rulings." **Commonwealth v.**

---

[5] Following the denial of Jones' post-sentence motions, counsel "inadvertently filed an incorrect pleading instead of a notice of appeal as requested by [] Jones." Petition to Reinstate Direct Appeal Rights, 6/16/25, at ¶ 11 (unnecessary capitalization omitted). On June 16, 2025, counsel filed a petition to reinstate Jones' direct appeal rights, which the court treated as a petition under the Post Conviction Relief Act. **See** 42 Pa.C.S.A. §§ 9541-9546. That same day, the court issued an order reinstating Jones' direct appeal rights, nunc pro tunc.

**Diggs**, 949 A.2d 873, 880 (Pa. 2008). This Court's review is limited to determining "whether the trial court abused its discretion by reaching a manifestly unreasonable judgment, misapplying the law, or basing its decision on partiality, prejudice, bias, or ill-will." **Clay**, 64 A.3d at 1056.

Jones argues that the guilty verdicts were against the weight of the evidence "given the lack of direct evidence connecting him to the crimes, the unreliable testimony of a biased witness, the lack of any motive, and the absence of key evidence including the firearm used in the shooting." Brief of Appellant, at 25. In particular, Jones asserts that "the Commonwealth's entire case" rested on the allegations of Alexander, a "witness who had every reason to fabricate his testimony," as he was not only facing charges arising from the instant case, but had 32 drug-related counts pending in Beaver County. **Id.** at 27, 30. Jones notes that, in conjunction with Alexander's guilty plea to six counts in the Beaver County matter, the Commonwealth agreed to advise that court at sentencing of Alexander's cooperation in this case. **Id.** at 30. Additionally, Alexander had a history of crimen falsi convictions. **Id.** at 28.

Jones further argues that the co-conspirators drove in Alexander's vehicle to the Marathon gas station, Alexander's gun was used to shoot the victim, and Alexander was an admitted drug dealer in the Pittsburgh area with a motive to "eliminate the competition," i.e., the victim. **Id.** Conversely, Jones lived in Chicago and there was no evidence that he had any connection with, or knowledge of, the victim. **Id.** at 28.

Following the shooting, Jones notes that Alexander was recorded on a Ring camera in his bedroom contradicting his testimony at trial that he did not know either the victim or the motive for the shooting. *Id.* at 28-29 (quoting Alexander's statements that "**we** caught them niggas last night;" "**we** drop somebody at the club last night;" and "**we** did it at the gas station") (emphasis in original). Jones further notes that, two days after the shooting, Alexander fled to Detroit, where he stayed for a few days before returning to Pittsburgh. *Id.* at 30.

Finally, Jones argues that there were "[n]o independent and unbiased witnesses [who] testified as to who was seated in [the Jeep, Jaguar, and Range Rover] and where they were sitting." *Id.* at 32. The video recording of the shooting does not show whose arm was extended outside the Jeep or where that person was sitting in the vehicle. *Id.* Jones argues that "when the Jeep later drove to Alexander's house, only one person walked from the lot to Alexander's front door. Since James was indisputably driving, it could only have been him. It is reasonable to infer from this fact that Jones was[ not] in the Jeep." *Id.* (citation to record omitted).

In response, the Commonwealth simply argues that Jones is asking this Court to "weigh the evidence on its own. Such weighing, however, is solely for the jury, not a reviewing court." Brief of Appellee, at 9 (citations omitted).

The trial court addressed Jones' weight claim as follows:

Contrary to [Jones'] assertions, the evidence admitted regarding the identity of the perpetrator(s) was unambiguous and credibly

- 7 -

proved [Jones] guilty in this matter. As such, the verdicts were not "pure conjecture."

[T]he evidence presented at trial showed that [Jones] was with both Alexander and James on the day and evening of the murder. [Jones], along with Alexander and James, drove to the club that night, with [Jones] and Alexander going into the club during the time in which the victim was present. Upon leaving the club, [Jones], James, and Alexander followed the victim by vehicle with[] James driving, [Jones] in the front passenger seat, and Alexander in the rear passenger seat. En route[ to the Marathon gas station,] they discussed the "hit" on the victim, and [Jones] retrieved the weapon from the center console. Once there, James pulled the vehicle in parallel to the victim's car in order to allow [Jones] to more easily shoot the victim as the victim was at the gas pump. The three then fled the scene. The evidence unequivocally showed [Jones] was well aware of the "hit" that had been placed on the victim and had carried out that intended "hit" when he shot and killed the victim that night. The evidence further established that he conspired with the others to commit the crime and flee the area. Further, various cell phone records placed [Jones] with [James] and Alexander at the Ross Park Mall earlier in the day and in the area of the club around the time of the murder and at Alexander's residence shortly after the crime.

Viewing all the evidence admitted at trial, including the physical, video, and testimonial evidence, it is clear that the guilty verdicts . . . were not against the weight of the evidence. ***See Commonwealth v. Smith***, 985 A.2d 886, 897 (Pa. 2009) (holding [] defendant's convictions for first-degree murder and conspiracy were not against [] weight of [] evidence as [] evidence presented at trial clearly established defendant's guilt as to [] crimes, and as such, [] verdict did not shock one's sense of justice).

Trial Court Opinion, 10/16/25, at 10-11.

Upon review, we discern no abuse of discretion on the part of the trial court. The jury was made aware of Alexander's agreement with the Commonwealth that, in exchange for his testimony, the Commonwealth would accept a plea to one firearms offense and one count of tampering with

evidence[6] and advise the sentencing court in Beaver County of Alexander's cooperation in this matter. Alexander was vigorously cross-examined by both defense counsel regarding, inter alia, his prior untruthful statements to police, including initial claims that he knew nothing about the shooting; his prior crimen falsi convictions; the fact that he was a drug dealer; his statements that were recorded on the Ring camera; his agreement with the Commonwealth in this case; and his plea agreement in Beaver County. *See* N.T. Trial, 10/17/24, at 258-96 (Jones' counsel's cross-examination of Alexander); *id.* at 297-316 (James' counsel's cross-examination of Alexander). The jury heard the testimony of all the witnesses, including Alexander, and had an opportunity to assess their credibility. As an appellate court, we may not reweigh the evidence and substitute our judgment for that of the jury. *See Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004) ("This Court cannot substitute its judgment for that of the jury on issues of credibility"); *Commonwealth v. Gibson*, 720 A.2d 473, 480 (Pa. 1998) ("Credibility determinations are strictly within the province of the finder of fact; therefore, an appellate court may not reweigh the evidence and substitute its judgment for that of the finder of fact"). Here, the jury chose to credit the Commonwealth's evidence, including Alexander's testimony. The jury's determination is supported by the record. Accordingly, the trial court

---

[6] The Commonwealth originally also agreed to prosecute Alexander for no higher than third-degree murder, with a sentence of 10 to 20 years. *See* N.T. Trial, 10/16/24, at 250. However, a grand jury declined to indict him. *Id.* at 251.

did not abuse its discretion by concluding that the verdict did not shock its conscience and, thus, was not against the weight of the evidence. ***Talbert***, ***supra***.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/9/2026