# Commonwealth v. McDonough.

*Joshua Lamancusa*, for plaintiff.
*Randall T. Hetrick*, for defendant.

COX, *J.*, January 14, 2013—Before the court for disposition is the omnibus pretrial motion consisting of a motion to suppress statements and evidence and a motion for habeas corpus relief and dismissal of charges. The motion to suppress statements and evidence contends that any statement made to police officers when the defendant was in custody in Louisiana should be suppressed as he invoked his right to counsel. The defendant, in his motion for habeas corpus relief and dismissal of charges, argues that the Commonwealth has failed to establish a prima facie case on all the charges for which the defendant was formally arraigned because of a lack of direct evidence. The court held two hearings on the defendant's omnibus pretrial motion, July 9, 2012, and October 31, 2012.

Joseph Marshall, who is a co-defendant, testified at the hearing held before this court on July 9, 2012. Mr. Marshall traveled to Perkins restaurant (hereinafter "Perkins") in 1992 with his cousin Gary Melinoski[1]. At that time, Mr.

---

1. Mr. Marshall, his cousins and his friends typically frequented Pe -

Marshall noticed a man and two women glancing in the direction of his table and they soon approached. The man introduced himself as Paul[2] and Mr. Marshall was also introduced to the two women, one of which was Laura Thompson, the victim. Mr. Ross, the victim and the other woman[3] sat down at Mr. Marshall's table and they conversed for approximately an hour before Mr. Marshall and Mr. Melinoski left the restaurant. The victim and Mr. Marshall did not make any arrangements for future meetings at that time. Shortly after Christmas in 1992, Mr. Marshall was at Perkins with his cousin, John[4], when Mr. Ross, the victim and two other women[5] noticed his presence and sat at his table. Eventually, John left the restaurant, but Mr. Marshall stayed to continue the conversation for another hour. He was then driven home by Mr. Ross. They were accompanied by the victim and the unidentified woman from their previous encounter. Before taking Mr. Marshall home, they stopped at the unidentified woman's residence. They entered the residence and the victim sat next to Mr. Marshall while Mr. Ross and the other woman went into another room. At that time, Mr. Marshall and the victim exchanged telephone numbers. Mr. Marshall called the victim and they made arrangements to see each other and go to the defendant's residence to "hang out" with the defendant and his girlfriend on January 6, 1993.

On that day, the defendant drove alone to the residence

---

kins to drink coffee and eat.

2. It was later discovered that Paul's full name is Paul Ross.

3. The identity of the other woman was not provided to the court.

4. John's last name was not revealed on the record and is currently unknown by the court.

5. One of the women was the unidentified woman from Mr. Marshall's previous encounter with Paul and the victim. The identity of the second woman is also unknown to the court.

of Mr. Marshall, who then accompanied him to the victim's residence where she also joined them in the vehicle. They proceeded to the defendant's residence and the defendant served them alcoholic beverages. The defendant also made a telephone call at some point. The defendant then suggested that they go outside and build a fire at the fire pit. Outside, he began gathering fire wood and placing it in the fire pit. However, he never lit the fire and the defendant suggested they go to the "cabin"[6]. There was no electricity in the cabin and it was illuminated by a lantern. The defendant then built a fire inside the cabin. The three of them sat around the fire with the victim sitting next to Mr. Marshall and the defendant seated directly across from them approximately four to five feet away. They were in the cabin for approximately 15 minutes when the defendant looked at the victim and said, "I am going to kill you" in a voice described by Mr. Marshall as sinister or evil sounding. The defendant then lunged at the victim and knocked her to the ground. Mr. Marshall noticed a knife in the defendant's hand at that time. The defendant and the victim began wrestling on the ground with the defendant stabbing her repeatedly. The skirmish lasted approximately 15 seconds. The victim was not moving after the defendant finished stabbing her. The defendant then forcefully removed the victim's clothing. He pulled down his zipper exposing his penis. The defendant spread the victim's legs, laid on top of her and began making a "humping" motion, which lasted less than one minute. As he did that, the defendant continued to look in Mr. Marshall's direction. When the defendant stopped, he

---

6. The cabin is a reference to a make-shift shelter created by fol - age and one wooden wall built by the defendant and his brother near the defendant's residence.

stood up, grabbed her by the wrist and dragged her into the woods about 25 feet away from the cabin.

The defendant and Mr. Marshall then walked to the defendant's trailer to retrieve a shovel. At that time, the defendant threatened to kill Mr. Marshall if he revealed what happened. They brought the shovel to where the victim's body was located and the defendant used the shovel to clear the brush away from that area. He placed the victim in the spot he cleared with the shovel and covered her body with the excess brush. Then the defendant and Mr. Marshall returned to the defendant's trailer. Upon returning to the trailer, Mr. Marshall asked the defendant why he killed the victim and he responded, "for shits and giggles." The defendant also stated that he was an expert at killing people as he had killed five or six times previously. Mr. Marshall returned home at approximately 5:30 a.m. on January 7, 1993.

Mr. Marshall saw the defendant on several occasions following that incident and on the third occasion, the defendant informed Mr. Marshall that he discarded the victim's skull, teeth and hands. He also stated that he wanted Mr. Marshall to dispose of the rest of the victim's body. Eventually, Mr. Marshall returned to remove the remainder of the victim's body with his girlfriend Shannon Robinson, whom he later married. She then was known by the name Shannon Marshall. When they returned to the location of the victim's body, the weather was warmer, which he indicated was during the spring or fall. Upon arriving at that location, Ms. Marshall remained by a retaining wall to be watchful for other people while Mr. Marshall retrieved the victim's remains. When he arrived at the burial location, he noticed all that remained were

bones and it did not appear to be a full skeleton. Mr. Marshall also noted that the hands and skull were missing. He then placed the remaining bones into a burlap sack, placed the sack in his vehicle, went home and disposed of the bones in a ravine. Mr. Marshall spoke with the defendant a few weeks later and the defendant related that he returned to the burial location and observed that the bones were gone.

The defendant relocated to Louisiana in the mid-to-late 1990s. Special Agent Christopher DiMenna of the fFederal Bureau of Investigation and member of the New Orleans Violent Crime Task Force was informed by Special Agent Tom Carter[7] of the same agency that there was an arrest warrant for the defendant. Special Agent Carter requested that Special Agent DiMenna assist in apprehending the defendant. This sparked the interest of Special Agent DiMenna as there were several unsolved murders of young women in western Louisiana with general similarities to the victim's murder. Special Agent David Hart of the office of the attorney general and officer J.J. Paglia of the New Castle Police Department traveled to Louisiana and brought the warrant for which the defendant was arrested. The defendant was arrested at 6:00 a.m. on September 27, 2010, at a John Deere plant where he worked in Thibodaux, Louisiana. Trooper Saunders Craine of the Louisiana State Police placed the defendant in custody and conducted a pat-down search to ensure that the defendant did not possess any weapons. He also provided the defendant with *Miranda* warnings. The defendant was not asked any questions while being

---

7. Special Agent Carter was assisting the New Castle police depar -ment and the Pennsylvania state police investigate the victim's murder.

transported to the Lafourche Parish Sheriff's Department. The defendant was placed in a room that measured 12 feet by 12 feet, was without windows, had a small table and several chairs. The door was left partially ajar. The defendant was sitting farthest from the door and Trooper Craine was directly across a table from him while Special Agent DiMenna sat between the two on Trooper Craine's left side. Again, the defendant was provided with *Miranda* warnings and given water to drink. The defendant stated that he understood his rights and signed a Statement of Rights Form, which was provided by Trooper Craine, acknowledging he received the warnings. On that form, the defendant provided his birth date and checked a series of three boxes. It must be noted that the defendant checked a box indicating that threats or promises were made to him; however, Special Agent DiMenna testified there were no threats or promises made at that time. He also explained if they would have noticed that the box was checked, they would have discussed it further with the defendant. The defendant testified that no threats or promises were made by Special Agent DiMenna or Trooper Craine at that time.

After all of those events, the defendant agreed to speak with Special Agent DiMenna and Trooper Craine. The defendant asked why he was being arrested and he was informed that there was a warrant for his arrest issued by the Commonwealth of Pennsylvania. He was also informed that they were investigating a series of murders in Louisiana as well. The defendant then agreed to have a DNA sample taken by opening his mouth wide and nodding his head affirmatively. Two samples were taken at that time, which were sent to the case agent in Pennsylvania

and the case agent in Louisiana. During that process, the defendant remained very polite and cordial with the police officers. Special Agent DiMenna and Trooper Craine showed the defendant pictures of the women murdered in Louisiana and asked if he recognized any of them. He denied traveling to Jennings, Louisiana, where the women were murdered, and he said he did not recognize any of those victims. He was then shown a picture of the victim in this case which elicited a response that, as described by Special Agent DiMenna, caused the defendant to appear ill and the defendant questioned whether he knew her from high school. The law enforcement officers and the defendant began speaking about other topics and returned to discussing the victim in this case when the defendant indicated that he watched the television show "Law and Order" for 30 years and he believed he should "lawyer up." However, he did not explicitly ask to be represented by counsel at that time. Special Agent DiMenna again mentioned an attorney, but the defendant did not request to be provided with counsel at that time. The defendant indicated that he wanted to speak with the detectives from Pennsylvania. It must be noted that the defendant provided Special Agent Dimenna with consent to search his residence as long as his dogs were not injured, so arrangements were made with the defendant's wife prior to the search.

Officer J.J. Paglia and Special Agent Hart were waiting outside of the room where the defendant was being questioned. Special Agent DiMenna asked the defendant if he wanted an attorney present or if he wanted to speak with the law enforcement officers from Pennsylvania. The defendant stated that he desired to speak with the

Pennsylvania officers. Upon entering the room, Special Agent Hart informed the defendant that he was under arrest for homicide and gave the defendant a synopsis concerning his arrest. Special Agent Hart instructed the defendant to remain silent until he was finished speaking and then the defendant could provide a statement if he chose to do so. After Special Agent Hart was finished speaking and before any questions were asked, the defendant informed him that everything the agent said was true but was backwards. At that time, the agent explained that Officer Paglia was going to read the defendant his *Miranda* rights. Officer Paglia provided the defendant with the standard *Miranda* statement document that is issued by the New Castle Police Department which contained a recitation of the defendant's *Miranda* rights. The defendant placed his initials next to each line as it was read by Officer Paglia. There is a space provided on that document for "the signature of person writing statement"; however, the defendant did not sign in that space because he was not providing the police officers with a written statement. The defendant was willing to provide the officers with an oral statement, which he did on three occasions. During the defendant's third interview, the Pennsylvania Law Enforcement Officers attempted to record the conversation and transfer that recording onto a disk. However, it did not properly transfer onto a disk and it was deleted from the recording device before it could be salvaged. According to Special Agent Hart, the defendant did not ask them to have an attorney present. The defendant testified that he requested an attorney on two occasions during the interviews and he mentioned to Special Agent Hart that he preferred Leslie Clement, Esquire, who represents him in a case concerning a motor vehicle accident in Louisiana, as

his attorney. The defendant admitted that the first time he mentioned an attorney during his interview with Special Agent DiMenna and Trooper Craine, he was merely asking if he needed counsel and was not demanding the presence of an attorney.

The defendant was charged in Lawrence County with criminal homicide[8], murder of the first degree[9], murder of the second degree[10], murder of the third degree[11], eight counts of conspiracy[12], two counts of abuse of corpse[13], rape-forcible compulsion[14] and rape-unconscious victim[15].

First, the defendant contends that any statement made to police officers when the defendant was in custody in Louisiana should be suppressed as he invoked his right to counsel.

"As to one's right against self-incrimination, a person must be informed of his or her *Miranda* rights prior to custodial interrogation by police." *Miranda v. Arizona*, 384 U.S. 436 (1966); *Commonwealth v. Sites*, 427 Pa. 486, 235 A.2d 387 (1967). "Interrogation' means police questioning or conduct calculated to, expected to, or likely to evoke an admission." *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998). Interrogation occurs when the police should know that their words or actions are reasonably likely to elicit an incriminating

---

8. 18 Pa.C.S.A. §2501(a).
9. 18 Pa.C.S.A. §2501(a).
10. 18 Pa.C.S.A. §2501(b).
11. 18 Pa.C.S.A. §2501(c).
12. 18 Pa.C.S.A. §903.
13. 18 Pa.C.S.A. §5510.
14. 18 Pa.C.S.A. §3121(1).
15. 18 Pa.C.S.A. §3121(3).

response, and the circumstances must reflect a measure of compulsion above and beyond that inherent in custody itself. *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116 (2001). Clearly, the Pennsylvania courts have established that any statements made as a result of a custodial interrogation are presumptively involuntary and inadmissible, unless the accused is advised of his or her *Miranda* rights. *Commonwealth v. Levanduski*, 907 A.2d 3, 23 (Pa.Super. 2006) (citing *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa.Super. 2001)); See also *Commonwealth v. Pakacki*, 587 Pa. 511, 524, 901 A.2d 983, 991 (2006). A custodial interrogation has been defined as "questioning initiated by the police after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *Commonwealth v. Clinton*, 905 A.2d 1026, 1032 (Pa.Super. 2006) (citing *Commonwealth v. Ingram*, 814 A.2d 264, 271 (Pa.Super. 2002)). An interrogation occurs when a police officer should have known that his or her actions or words were reasonably likely to elicit an incriminating response from the defendant. *Commonwealth v. Hughes*, 536 Pa. 355, 371, 639 A.2d 763, 771 (1994) (citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Commonwealth v. Whitley*, 500 Pa. 442, 457 A.2d 507 (1983)). However, unsolicited remarks that are not the result of a custodial interrogation constitute voluntary and spontaneous statements, which are not subject to suppression. *Commonwealth v. Fisher*, 564 Pa. 505, 520, 769 A.2d 1116, 1125 (2001) (citing *Commonwealth v. Gibson*, 553 Pa. 648, 662, 720 A.2d 473, 480 (1998)).

In *Commonwealth v. Whitley*, 500 Pa. 442, 457 A.2d 507 (1983), the court addressed the admissibility of unsolicited

statements made by an accused to a police officer prior to receiving *Miranda* warnings. In that case, an off-duty police officer was in a bar when he was approached by employees and patrons of that bar indicating that the appellant wanted to surrender to him. The police officer and the appellant met at an appointed location and began walking to the nearby police station. While they were walking, the police officer informed the appellant that the police and the victim's family were looking for him, and the appellant stated, "I didn't mean to shoot the fellow, it was all a mistake." The police officer responded by informing the appellant to be quiet and he "didn't want to hear it." The police officer did not ask the appellant any questions. The appellant filed a motion to suppress that statement, which was denied by the trial court. He appealed to the superior court of Pennsylvania arguing that those statements should have been suppressed because he was not provided with *Miranda* warnings prior to speaking.

The *Whitley* court reiterated that inculpatory statements produced during a police interrogation that are not preceded by proper *Miranda* warnings are subject to suppression. *Id.*, 500 Pa. at 445, 457 A.2d at 508 (citing *Commonwealth v. Simala*, 434 Pa. 219, 226, 252 A.2d 575, 578 (1969)). "Where there is absent any notion of interrogation, the statement is classified as a volunteered statement, gratuitous and not subject to suppression for lack of warnings." *Id.* (citations omitted). Therefore, the court affirmed the decision of the trial court because the appellant's statement was voluntary and not the product of an interrogation by the police officer. *Id.*

In the case sub judice, Special Agent Hart informed the defendant that he was under arrest for homicide and

he gave the defendant a synopsis concerning his arrest. Special Agent Hart instructed the defendant to remain silent until he was finished speaking. At that time, the defendant could provide a statement if he chose to do so. However, the defendant interjected that everything the agent said was true but was backwards. After that statement, the defendant was provided with *Miranda* warnings by Officer Paglia. This situation is analogous to the statement made by the appellant in *Whitley* as both statements were unsolicited. Moreover, in the current matter, Special Agent Hart instructed the defendant to remain silent and listen to what was being said. It was the defendant who decided to issue a voluntary statement prior to being informed of his rights. Hence, the statement made by the defendant that everything Special Agent Hart said was true but was backwards is admissible as it was a voluntary statement made by the defendant without any action to elicit such a response by the police officers.

Once a defendant specifically invokes his or her Fifth Amendment right to counsel, the government officials are not permitted to initiate a subsequent interrogation without counsel being present, even if the defendant agrees to waive his rights. *Commonwealth v. King*, 554 Pa. 331, 354, 721 A.2d 763, 774 (1998) (citing *Commonwealth v. Santiago*, 528 Pa. 516, 522, 599 A.2d 200, 202-203 (1991)). It is incumbent on the defendant to demonstrate that he or she invoked his or her Fifth Amendment right to counsel. *Id.* (citing *Commonwealth v. Marinelli*, 547 Pa. 294, 319-320, 690 A.2d 203, 216 (1997)). "[*Miranda*] requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by

the police." *Commonwealth v. Hayes*, 755 A.2d 27, 33 (Pa. Super. 2000) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). An accused who expresses a desire to deal with police only through counsel is not subject to further interrogation unless that defendant initiates further communication or conversations. *Commonwealth v. Hackney*, 353 Pa. Super. 552, 558, 510 A.2d 800, 803 (1986) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378, 386 (1981)). In deciding whether the defendant asserted his or her right to counsel, the trial court must take into account all of the facts and circumstances surrounding the alleged interrogation. *Commonwealth v. Tenney*, 21 Pa.D.&C.4th 160, 164 (Pa. Com. Pl. Crawford 1993).

The Pennsylvania courts have addressed this issue under many different circumstances. In *Commonwealth v. Martin*, 607 Pa. 165, 181, 5 A.3d 177, 186 (2010), the court determined that the appellant clearly invoked his right to counsel by stating, "that he did not wish to talk to anyone about anything until he had spoken with an attorney." Conversely, the court in *Commonwealth v. Cleveland*, 14 Pa.D.&C. 5th 99, 117 (Pa. Com. Pl. Delaware 2010), ruled that a defendant inquiring whether he could speak with counsel after his release from the hospital did not invoke his right to counsel because he failed to unambiguously demand an attorney be present.

In the current case, the defendant contends that he asserted his right to counsel on several occasions during both of his interrogations. During the first interrogation by Trooper Craine and Special Agent DiMenna, the defendant was read his *Miranda* rights and signed a statement of

rights form stating that he understood his rights. At that time, the defendant asked why he was being arrested and the law enforcement officers indicated it was regarding homicide charges in Pennsylvania. They also stated they were investigating a series of murders in Louisiana as well. Special Agent DiMenna and Trooper Craine showed the defendant pictures of the women murdered in Jennings, Louisiana and asked if he recognized any of them. He denied going to Jennings, Louisiana, and he said he did not recognize any of those victims. He was then shown a picture of the victim in this case, which elicited a physical response to the image. The law enforcement officers and the defendant began speaking about other topics and returned to discussing the victim in this case when the defendant indicated that he watched the television show "Law and Order" for 30 years and he believed he should "lawyer up." It must be noted that the defendant testified he wanted to keep the conversation cordial and the aforementioned comment regarding a lawyer was made in jest. Special Agent DiMenna asked the defendant if he wanted an attorney present or if he desired to speak with the law enforcement officers from Pennsylvania. The defendant indicated that he wished to speak with the officers from Pennsylvania.

Upon entering the room, Special Agent Hart of the Office of the Attorney General of Pennsylvania informed the defendant that he was under arrest for homicide and he gave the defendant a synopsis concerning his arrest. Special Agent Hart instructed the defendant to remain silent until he was finished speaking and later the defendant could provide a statement if he chose to do so. Special Agent Hart gave a brief synopsis of the charges

and the defendant immediately stated he had everything correct, but it was backwards. Officer Paglia provided the defendant with the standard *Miranda* statement document that is issued by the New Castle Police Department which contained a recitation of the defendant's *Miranda* rights. The defendant placed his initials next to each line as it was read by Officer Paglia. There is a space provided on that document for "the signature of person writing statement"; however, the defendant did not sign there because he was not providing the police officers with a written statement. The defendant provided the officers with three oral statements. The third oral statement was recorded, but it could not be transferred successfully and the recording was inaccessible. According to Special Agent Hart, defendant did not ask them to have an attorney present. The defendant testified that he requested an attorney on two occasions during the interviews and he mentioned the name Leslie Clement, Esquire, as the attorney he preferred because he represents the defendant in a personal injury case concerning a motor vehicle accident in Louisiana.

It is apparent that the law enforcement officers provided the defendant with his *Miranda* warnings on several occasions during his interrogation. There are two forms introduced by the Commonwealth identified as Commonwealth's Exhibits 3 and 4 indicating that the defendant was informed of his rights and understood them; however, there are some defects in those forms. First, question 8 of the statement of rights provided by Trooper Craine contains a checkmark in the box for yes when asked if any threats or promises were made to the defendant to answer questions or waive his rights. However, this appears to be an oversight as there is no

testimony to indicate that threats or promises were made to the defendant. It must be noted that the defendant testified that no threats or promises were made to induce him to waive his rights. Moreover, the *Miranda* statement document provided by Officer Paglia does not have the defendant's signature because the space provided stated, "signature of person writing statement." The defendant provided an oral, but not a written statement, so he refused to sign that document. It must be noted that the defendant placed his initials next to all six of the spaces provided for each right that was read to him by Officer Paglia. The defendant also placed his initials next to a line on the *Miranda* statement indicating that he understood his rights and they were read to him by Officer Paglia. Moreover, the defendant acknowledged that he received his rights on several occasions. Although there are some small procedural deficiencies, the court finds that the defendant was informed of his rights and those deficiencies did not affect his ability to clearly understand his rights.

Next, the court must address whether the defendant clearly and unequivocally requested the assistance of counsel. The defendant asserts that he made several statements indicating that he wanted to obtain counsel. The first instance occurred while being interrogated by Trooper Craine and Special Agent DiMenna. The defendant indicated that he watched the television show "Law and Order" for 30 years and he believed he should "lawyer up." By his own admission, the defendant made that comment in jest to maintain the cordial atmosphere of the interrogation. Moreover, there is no indication in that statement that the defendant demanded the assistance of counsel. He merely stated that he believed he should

"lawyer up." There is no indication that he wished to halt the interrogation in order to obtain counsel to represent him.

The defendant also claimed that he asserted his right to counsel when he was interrogated by Special Agent Hart and Officer Paglia, which included a reference to Leslie Clement, Esquire, who represents the defendant in another matter in Louisiana. However, the only reference to that statement was made by the defendant. The court finds the other witnesses credible and they merely recalled the defendant's previous comment regarding the television show "Law and Order." The defendant did not clearly demand that he receive the assistance of counsel prior to any further interrogation by police officers. He jokingly stated that he watched the television show "Law & Order" for 30 years and he believed he should "lawyer up"; but, never asserted his right to have questioning halted until he obtained counsel. Therefore, there was no violation of *Miranda* regarding the custodial interrogations of the defendant by Special Agent DiMenna, Trooper Craine, Special Agent Hart and Officer Paglia. The defendant's motion to suppress statements and evidence is denied.

The defendant's omnibus pretrial motion also contains a motion for habeas corpus relief and dismissal of charges, which argues that the Commonwealth failed to establish a prima facie case on all the charges for which the defendant was formally arraigned because of a lack of direct evidence.

Where a criminal defendant seeks to challenge the sufficiency of the evidence presented at his preliminary hearing, he may do so by filing a petition for writ of habeas

corpus. *Commonwealth v. McBride,* 528 Pa. 153, 595 A.2d 589 (1995). In evaluating an accused's entitlement to pre-trial habeas corpus relief, a trial court must determine whether there is sufficient evidence to establish a prima facie case that the defendant committed the crimes with which he or she is charged. *Commonwealth v. Hock,* 556 Pa. 409, 728 A.2d 943 (1999). In a pre-trial habeas corpus proceeding, as in a preliminary hearing, the Commonwealth has the burden of establishing a prima facie case, offering some proof to establish each material element of the offense as charged. *Commonwealth v. Owen,* 397 Pa. Super. 507, 580 A.2d 412 (1990). This does not mean that the prosecution must prove the accused guilty beyond a reasonable doubt, but rather, the prosecution must establish "sufficient probable cause" that the accused has committed the offense. *Commonwealth v. Prosdocimo,* 331 Pa. Super. 51, 479 A.2d 1073 (1994). The Commonwealth must present evidence at a preliminary hearing to establish that a crime was committed and the probability the defendant could be connected with the crime. *Commonwealth v. Fox,* 422 Pa. Super. 225, 619 A.2d 327 (1993). A prima facie case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. *Commonwealth v. Fountain,* 811 A.2d 24 (Pa. Super. 2002).

The Commonwealth establishes a prima facie case when it produces evidence that, if accepted as true, would warrant the trial judge to allow the case to go to a jury. *Commonwealth v. Marti,* 779 A.2d 1177 (Pa. Super. 2001). The Commonwealth need not prove the elements of the crime beyond a reasonable doubt. *Id.* The prima facie case

merely requires evidence of the existence of each element of the crime charged. *Id.* Additionally, the evidence is to be reviewed in a light most favorable to the Commonwealth and the Commonwealth is entitled to reasonable inferences drawn from the evidence. *Id.* The weight and credibility of the evidence is not a factor at this stage, the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense. *Id.* Although a habeas corpus hearing is similar to a preliminary hearing, in a habeas corpus proceeding the Commonwealth has the opportunity to present additional evidence to establish that the defendant has committed the elements of the offense charged. *Commonwealth v. Karlson,* 449 Pa. Super. 378, 674 A.2d 249 (1996).

Criminal homicide occurs when a person "intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S.A. §2501(a). "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. §2502(a). Intentional killing is "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. §2502(d). The Commonwealth is required to prove that (1) a human being was unlawfully killed; (2) the defendant killed the victim; and (3) the defendant acted with the specific intent to kill. *Commonwealth v. Cousar,* 593 Pa. 204, 217, 928 A.2d 1025, 1032 (2007). The killing must have been done with malice aforethought, which is the general intent requirement that distinguishes murder from any other type of homicide. *Commonwealth v. Weinstein,* 499 Pa. 106, 115, 451 A.2d 1344, 1348 (1982). However, the Commonwealth is not required to prove motive to

establish that the defendant is guilty of first degree murder. *Commonwealth v. Brantner*, 486 Pa. 518, 522, 406 A.2d 1011, 1013 (1979) (citations omitted). "The specific intent to kill necessary to support a conviction of first-degree murder may be found from a defendant's words or conduct and may be inferred from the intentional use of a deadly weapon on a vital part of the body of another human being." *Commonwealth v. Agie*, 449 Pa. 187, 190, 296 A.2d 741, 742 (1972) (citing *Commonwealth v. Hornberger*, 441 Pa. 57, 61, 270 A.2d 195, 197 (1970)). The Commonwealth is not required to produce the victim's body or part of the body as long as it provides sufficient evidence from which the fact-finder may find that the victim's death resulted from the defendant's actions. *Commonwealth v. Lettrich*, 346 Pa. 497, 502-503, 31 A.2d 155, 158 (1943).

Murder of the third degree consists of "all other kinds of murder." 18 Pa.C.S.A. §2502(c). In other words, a defendant is guilty of murder of the third degree when the killing is neither intentional nor committed during the perpetration of a felony, but contains malice aforethought. *Commonwealth v. Morris*, 958 A.2d 569, 576 (Pa. Super. 2008) (citing *Commonwealth v. Tielsch*, 934 A.2d 81, 94 (Pa. Super. 2007); *Commonwealth v. Santos*, 583 Pa. 96, 102, 876 A.2d 360, 363 (2005)). The requisite level of malice for third-degree murder is wickedness of disposition, hardness of heart, recklessness of consequences or a mind regardless of social duty. *Id.* "Murder of the third degree is a killing done with legal malice but without specific intent to kill. Murder of the third degree can, however, in some cases involve the specific intent to harm a victim as long as said intent falls short of the specific intent to kill." *Commonwealth v. Pitts*, 486 Pa. 212, 219, 404 A.2d 1305,

1308 (1979). Essentially, third-degree murder consists of the same elements as first-degree murder, but does not require the specific intent to kill. *Commonwealth v. Malone*, 354 Pa. 180, 183, 47 A.2d 445, 447 (1946) (citing *Commonwealth v. Divomte*, 262 Pa. 504, 507, 105 A.821, 822 (1919)).

In the case sub judice, the Commonwealth has presented the testimony of Joseph Marshall at the hearing concerning the defendant's motion for habeas corpus relief and dismissal of charges. Mr. Marshall testified that he and the defendant traveled to the victim's residence and she accompanied them to the defendant's trailer to "hang out." While at the trailer, the defendant suggested that they build a fire outside. They exited the trailer and the defendant began placing firewood into a fire pit. However, he recommended that they go to the cabin instead of building a fire at the fire pit. They went to the cabin, which was illuminated by a lantern and a fire that the defendant subsequently lit. The victim sat next to Mr. Marshall while the defendant sat four to five feet away from them. The defendant then informed the victim that he was going to kill her and he lunged forward knocking her to the ground. At that time, Mr. Marshall saw a knife in the defendant's hand. The defendant and the victim were wrestling on the ground and Mr. Marshall observed the defendant stab the victim repeatedly. The skirmish lasted approximately 15 seconds and the victim was lying on the ground motionless. The defendant forcefully removed the victim's clothing and pulled down the zipper on his own pants exposing his penis. The defendant spread the victim's legs, laid on top of her and began making a "humping" motion. Mr. Marshall stated that the defendant stopped

after one minute and stood up. The defendant grabbed the victim's wrist and dragged her approximately 25 feet into the woods.

Clearly, the Commonwealth has presented sufficient evidence to establish a prima facie case that the defendant committed the crimes of first- and third-degree murder. The Commonwealth has provided evidence that the defendant intentionally killed the victim as Mr. Marshall explained that the defendant informed the victim he was going to kill her prior to commencing his attack. He proceeded to lunge at the victim knocking her to the ground and stabbed her repeatedly until she was no longer struggling with him. Moreover, the Commonwealth was able to establish that the victim is dead without having her body as Mr. Marshall testified that the defendant dragged her motionless body into the woods where he created a shallow grave for her and covered her body with brush. The defendant later returned to remove the victim's skull, teeth and hands to avoid being apprehended. Upon the defendant's request, Mr. Marshall returned to the wood and retrieved the victim's remaining bones and disposed of them at a ravine near his residence. By presenting the testimony of Mr. Marshall, who is the only eye witness to the murder, the Commonwealth has established a prima facie case in which the defendant intentionally killed the victim as is required to prove the crime of murder in the first degree. Moreover, the Commonwealth has provided sufficient facts to create a prima facie case for murder of the third degree as it is a lesser included offense of first-degree murder.

The Commonwealth has also charged the defendant with two counts of abuse of corpse, which is proven by

establishing the defendant treated "a corpse in a way that he knows would outrage ordinary family sensibilities." 18 Pa.C.S.A. §5510. This statute was drafted broadly and used general language to ensure that offenses like concealing a corpse was within the scope of 18 Pa.C.S.A. §5510. *Commonwealth v. Smith*, 389 Pa. Super. 606, 612, 567 A.2d 1070, 1073 (1989). In *Smith*, the court held that the appellant's concealment of her daughter's corpse from authorities and failure make burial arrangements, which led to the corpse being eaten by rodents and becoming mummified, violated 18 Pa.C.S.A. §5510. *Id.*

Additionally, penetration after death falls within the purview of 18 Pa.C.S.A. §5510, but not 18 Pa.C.S.A. §3121. *Commonwealth v. Sudler*, 496 Pa. 295, 436 A.2d 1376 (1981). In *Sudler*, the body of the victim, an 80 year-old woman, was discovered in the bedroom of her apartment where she lived alone. She died as a result of a knife wound to her throat and she had lacerations of her hands, face and chest. A medical examination also revealed the presence of sperm in the victim's vagina. The assailant entered the residence through a kitchen window and ransacked the apartment in an attempt to find valuables. Three days after the victim's death, two acquaintances of the appellant informed police officers that the appellant admitted to killing the victim. One of those two recalled that the appellant said he "used his big knife" to cut the throat of the "lady that lives near the playground" and he removed whiskey from her apartment. That person also stated he observed a red substance on the appellant's shoes, which he identified as blood. The police obtained warrants to arrest the appellant and to search his residence, where they discovered a knife with an 18-inch blade and

two empty whiskey bottles. The appellant then gave a statement admitting that he broke into the apartment, killed the victim with a knife and took the liquor, but he denied having sex with her. The appellant was charged with murder of the first degree, burglary and rape. He challenged the sufficiency of the Commonwealth's evidence and the legality of the search pursuant to the warrant. He was then tried and convicted on all of the charges. The trial court held that the Commonwealth presented ample evidence for all of the charges. The appellant then filed an appeal challenging the sufficiency of the Commonwealth's evidence.

The *Sudler* Court stated that the record clearly supported the guilty verdicts for murder of the first degree and burglary, but there was insufficient evidence to establish the rape charge. *Sudler*, 496 Pa. at 302, 436 A.2d 1379. The court determined that penetration after death is not within the definition of rape as stated in 18 Pa.C.S.A. §3121. The court reiterated that the rape statute states:

A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(3) who is unconscious; or

(4) who is so mentally deranged or deficient that such person is incapable of consent. *Id.* (quoting 18 Pa.C.S.A. §3121).

The *Sudler* Court also set forth the definition of abuse of corpse as stated in 18 Pa.C.S.A. §5510, which explains, "Except as authorized by law, a person who treats a corpse in a way that he knows would outrage ordinary sensibilities commits a misdemeanor of the second degree." *Id.* It also provided the model penal code section on which 18 Pa.C.S.A. §5510 was based reads as follows:

> There are occasional legislative provisions penalizing sexual relations with or disrespectful treatment of corpses. The section is included here rather than in the chapter on sexual offenses because there we were concerned primarily with preventing physical aggressions, whereas here we deal with outrage to the feelings of surviving kin, outrage which can be perpetrated as well by mutilation or gross neglect as by sexual abuse. *Id.*

The *Sudler* Court reasoned that, "Although the evidence supports a conclusion that appellant was responsible for the presence of sperm in the victim's vagina, there is no evidence to support a conclusion beyond a reasonable doubt that penetration occurred before the killing." *Id.*, 496 Pa. at 303, 436 A.2d at 1380. Therefore, the court overturned the appellant's conviction for rape because there was insufficient evidence for the jury to determine that penetration occurred prior to the victim's death. *Id.*, 496 Pa. at 304, 436 A.2d at 1380. As such, the court indicated that the proper charge for penetration after the victim's death is abuse of corpse as stated in 18 Pa.C.S.A. §5510. *Id.*

In the current case, the Commonwealth presented sufficient evidence that the defendant committed abuse

of corpse for attempting to have sexual intercourse with the victim's corpse and abuse of corpse for severing and removing the head and hands from the victim's body. First, Mr. Marshall testified that the defendant killed the victim by repeatedly stabbing her and forcefully removed her clothing. He also pulled down his zipper exposing his penis, spread the victim's legs, laid on top of her and began making a "humping" movement. It must be noted that Mr. Marshall testified that he could not determine whether there was penetration at that time. As indicated by the *Sudler* Court, 18 Pa.C.S.A. §5510 was enacted to prevent a person from performing that type of sexual behavior with a corpse, even without penetration, as it would clearly offend and outrage normal family sensibilities. Moreover, the defendant is charged with abuse of corpse for removing the skull, teeth and hands of the victim. Mr. Marshall testified the defendant informed him that he returned to the shallow grave he dug for the victim and removed her skull, teeth and hands to prevent identification of the corpse. Again, this action is sufficient to outrage normal family sensibilities as the defendant mutilated the victim's corpse by removing several body parts to avoid identification and he concealed the victim's body preventing her family from conducting a proper burial. Therefore, the Commonwealth has presented a prima facie case for both counts of abuse of corpse.

The information also indicates that the defendant is charged with rape by forcible compulsion and rape of an unconscious victim in violation of 18 Pa.C.S.A. §3121. A rape occurs when the defendant "engages in sexual intercourse with another person not his spouse by forcible compulsion; or by threat of forcible compulsion that would

prevent resistance by a person of reasonable resolution; or who is unconscious; or who is incapable of consent because of mental deficiency which would preclude the person of consenting." *Commonwealth v. Williams*, 294 Pa. Super. 93, 97, 439 A.2d 765, 767 (1982) (citing 18 Pa.C.S.A. §3121). Penetration is an essential element of rape along with the use of force and absence of consent of the victim. *Commonwealth v. Moon*, 151 Pa. Super. 555, 561, 30 A.2d 704, 708 (1943) (citations omitted). However, there is no requirement that penetration reach the vagina. *Commonwealth v. Poindexter*, 435 Pa. Super. 509, 517, 646 A.2d 1211, 1214 (1994) (citing *Commonwealth v. Trimble*, 419 Pa. Super. 108, 112, 615 A.2d 48, 50 (1992)). Without proof of penetration, the Commonwealth fails to prove the charge of rape. *Commonwealth v. Romanoff*, 258 Pa. Super. 452, 460, 392 A.2d 881, 884 (1978). That element may be proven through direct testimony or circumstantial evidence. *Commonwealth v. Wall*, 953 A.2d 581, 584 (Pa. Super. 2008) (citing *Commonwealth v. Stambaugh*, 355 Pa. Super. 73, 512 A.2d 1216, 1219 (1986)).

In the case sub judice, the Commonwealth failed to produce evidence sufficient to establish a prima face case for the two rape charges as there was no testimony or evidence regarding penetration. Mr. Marshall testified that the defendant forcefully removed the victim's clothing, pulled down his own zipper exposing his penis, spread the victim's legs and laid on top of her. Then the defendant began making a "humping" movement. However, Mr. Marshall, upon questioning by the district attorney, stated that he could not determine if there was penetration. Moreover, the victim's body was not located and there is a lack of physical evidence to prove that penetration occurred.

As a result, the Commonwealth failed to establish prima facie cases for the charges of rape by forcible compulsion and rape of an unconscious victim.

In addition, the *Sudler* Court held that a defendant cannot be charged with rape when that defendant performs sexual acts with a corpse. The testimony in this case sets forth that the defendant stabbed the victim repeatedly and she was lying motionless and not making any noises. Subsequently, the defendant laid on top of the victim and began making a "humping" motion. That motion lasted for approximately one minute and the defendant stood up, grabbed the victim's wrist and dragged her body 25 feet into the woods. Clearly, the evidence indicates that the victim was dead when the defendant removed her clothes and performed the "humping" motion, which precludes him from being charged with rape as the proper charge under those circumstances is abuse of corpse.

The defendant is charged with murder of the second degree, which occurs when a murder is "committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S.A. §2502(b). Perpetration of a felony is "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S.A. §2502(d). Malice is inferred from the defendant's intent to commit the underlying crime and is imputed to the killing to establish second-degree murder, regardless of whether the defendant actually intended on harming the victim. *Commonwealth v. Lambert*, 795 A.2d 1010. 1022 (Pa. Super. 2002) (citing

*Commonwealth v. Mikell*, 556 Pa. 509, 729 A.2d 566, 569 (1999); *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833, 855 (1985)). The Commonwealth is required to prove that the defendant is guilty of a homicide while a felony was in progress and the killing occurred, but it is not necessary that the Commonwealth obtain a guilty verdict for the underlying felony. *Commonwealth v. Munchinski*, 401 Pa. Super. 300, 324, 585 A.2d 471, 483 (1990).

However, the Commonwealth has failed to establish that the defendant killed the victim in furtherance of a felony. As this court has stated previously, the Commonwealth has not presented sufficient evidence to establish prima facie cases for the rape charges, which were the underlying felonies for the charge of murder of the second degree. Moreover, the Commonwealth has failed to establish that the defendant committed or attempted to commit any other felony associated with killing the victim. The only remaining charges that are not associated with the charges of criminal homicide are the two counts of abuse of corpse, which are classified as misdemeanors of the second degree. Clearly, those do not qualify as felonies for the purposes of 18 Pa.C.S.A. §2502(b). As such, the Commonwealth has failed to establish a prima facie case for the charge of murder of the second degree.

The Commonwealth charged the defendant with several offenses of criminal conspiracy in violation of 18 Pa.C.S.A. §903(a)(1), which states:

(a) Definition of conspiracy. — A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime.

Criminal conspiracy also requires an overt act which means, "no person may be convicted of conspiracy to commit a crime unless an overt act in pursuant of such conspiracy is alleged to have been done by him or by a person with whom he conspired." 19 Pa.C.S.A. §903(e). In order to establish that a defendant committed criminal conspiracy, the Commonwealth must prove that the defendant "(1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa. Super. 1998) (quoting *Commonwealth v. Rios*, 546 Pa. 271, 283, 684 A.2d 1025, 1030 (1996)). It is not necessary that the Commonwealth establish the defendant committed the overt act, it is merely necessary to demonstrate that the co-conspirator committed that act. *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa. Super. 2002) (quoting *Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000)). Mere association with the perpetrator is insufficient to establish criminal conspiracy, and the Commonwealth must establish that the defendant shared the criminal intent with the perpetrator. *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) (citing *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa. Super. 1998)). "In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established through circumstantial evidence, such as by 'the relations, conduct, or circumstances of

the parties or overt acts on the part of co-conspirators.'" *Commonwealth v. Johnson*, 604 Pa. 176, 185, 985 A.2d 915, 920 (2009) (quoting *Commonwealth v. Spotz*, 552 Pa. 499, 524, 716 A.2d 580, 592 (1998)).

The defendant has been charged with 2 counts each of conspiracy regarding the charges criminal homicide, murder of the first degree and murder of the second degree and one count each of conspiracy to commit murder of the third degree and conspiracy to commit abuse of corpse. The Commonwealth has failed to present sufficient evidence to sustain the charges of conspiracy to commit the various degrees of criminal homicide as there is no evidence of an agreement between the defendant and Mr. Marshall. The evidence presented to this court establishes that the defendant, the victim and Mr. Marshall were "hanging out" inside the cabin constructed by the defendant when the defendant informed the victim that he was going to kill her. He then lunged at the victim and they were struggling with each other on the ground. Mr. Marshall observed a knife in the defendant's hand and the defendant was stabbing the victim. The skirmish lasted 15 seconds and the victim was no longer moving or making any noises. There is no evidence or testimony that the defendant and Mr. Marshall entered into an agreement to kill the victim or they had a shared criminal intent. Moreover, there is no overt act on behalf of Mr. Marshall to indicate that he was acting in furtherance of an agreement to kill the victim. The testimony merely establishes that the defendant acted on his own in killing the victim. Mere association by one person with another individual is insufficient to establish that a conspiracy occurred as there must be evidence of a shared criminal intent. Hence, there is insufficient

evidence to establish a prima facie case for each count of conspiracy to commit criminal homicide, murder of the first degree, murder of the second degree and murder of the third degree.

Conversely, the Commonwealth has presented sufficient evidence to establish that the defendant committed the crime of conspiracy to commit abuse of corpse. Mr. Marshall testified that the defendant contacted him shortly after the victim's death informing him that the defendant removed the victim's skull, teeth and hands from the shallow grave. The defendant also instructed Mr. Marshall to return to the victim's burial site and remove the remaining bones. Mr. Marshall complied with that request by placing the bones in a burlap sack and disposing of them at a ravine near his home. It is apparent that the defendant and Mr. Marshall made an express agreement to further disturb the victim's remains by moving them with the same intent to conceal the remains from being discovered. Those actions violate 18 Pa. C.S.A. §5510 as moving a deceased person's remains would certainly outrage ordinary family sensibilities as it conceals the same from being discovered and the family cannot conduct a proper burial. Therefore, the Commonwealth has presented sufficient evidence that the charge of conspiracy to commit abuse of corpse should proceed to trial.

For the reasons set forth in this opinion, the defendant's motion to suppress statements and evidence is denied because the law enforcement officers provided the defendant with *Miranda* warnings and the defendant did not assert his right to counsel during the interrogations. The defendant's motion for habeas corpus relief and dismissal of charges is granted in part and denied in part.

The Commonwealth has presented a prima facie case for the charges of criminal homicide, murder of the first degree, murder of the third degree, two counts of abuse of corpse and conspiracy to commit abuse of corpse. However, the charges of murder of the second degree, 2 counts of conspiracy to commit criminal homicide, 2 counts of conspiracy to commit murder of the first degree, 2 counts of conspiracy to commit murder of the second degree, conspiracy to commit murder of the third degree, rape by forcible compulsion and rape of an unconscious victim are dismissed as the Commonwealth has failed to present a prima facie case for these crimes.

## ORDER OF COURT

Now January 14, 2013, this case being before the court on July 9, 2012, and October 31, 2012, for hearings on the omnibus pre-trial motion in the nature of a motion to suppress statements and evidence and a motion for habeas corpus relief and dismissal of charges filed by the defendant, with both parties appearing, the Commonwealth of Pennsylvania, represented by counsel, Joshua Lamancusa, esquire, district attorney for the county of Lawrence and the defendant Sean M. McDonough, represented by counsel, Randall T. Hetrick, esquire and after hearings held and the submission of various case law by counsel for the defendant, the court enters the following order and it is hereby ordered, adjudged and decreed as follows:

1. In accordance with the attached opinion, the motion to suppress statements and evidence is hereby denied. The Commonwealth is permitted to use at trial any and all statements and evidence obtained from the defendant.

2. In accordance with the attached opinion, the motion

for habeas corpus relief and dismissal of charges is granted in part and denied in part.

3. The motion for habeas corpus relief and dismissal of charges regarding Count 1-criminal homicide, Count 2-murder of the first degree, count 4-murder of the third degree, Count 8-abuse of a corpse, Count 9-abuse of corpse, Count 10-conspiracy to commit abuse of corpse contained in the information are hereby denied. The Commonwealth shall be entitled to proceed to trial on said charges.

4. The motion for writ of habeas corpus relief and dismissal of charges regarding Count 3-murder of the second degree, Count 5-criminal conspiracy to commit criminal homicide, Count 6-criminal conspiracy to commit murder of the first degree, Count 7-criminal conspiracy to commit murder of the second degree, Count 11-criminal conspiracy to commit criminal homicide, Count 12-criminal conspiracy to commit murder of the first degree, Count 13-criminal conspiracy to commit murder of the second degree, Count 14-criminal conspiracy to commit murder of the third degree, Count 15-rape-forcible compulsion and Count 16-rape-unconscious victim contained in the information are hereby dismissed.

5. This case shall remain on the February 2013 criminal jury trial term.

6. The clerk of courts is directed to serve a copy of this order of court upon counsel of record, Joshua Lamancusa, esquire and Randall T. Hetrick, esquire.